Court of Appeals Docket No. 17-50197

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Plaintiff - Appellee,*

v.

NERSES NICK BRONSOZIAN
*Defendant - Appellant,*
_____

APPELLANT'S OPENING BRIEF
_____

**Appeal from the Judgement of the United States District
Court for the Central District of California
D.C. No. 2:16-cr-00196-SVW-1
(Honorable Stephen V. Wilson)**
_____

John L. Littrell, State Bar No. 221601
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Suite 350
San Clemente, California 92673
Telephone (949) 369-3700
Facsimile (949) 369-3701
jlittrell@bmkattorneys.com
On CJA Appointment

Attorneys for Defendant

NERSES NICK BRONSOZIAN

TABLE OF CONTENTS

Page

I.  INTRODUCTION ..........................................................................1

II. ISSUES PRESENTED...................................................................3

III. STATEMENT RE: ADDENDUM....................................................5

IV. STATEMENT OF THE CASE ......................................................6

V. STATEMENT OF FACTS……………………………………...6

 A. Course of Proceedings ...........................................................6

 B. Motion to Dismiss the Indictment........................................7

 C. Motions Related to the Informant…....................................8

 D. Trial.......................................................................................11

  The Government's Case……………………………………11

  The Defense Case…………………………………………...15

  Jury Deliberation…………………………………………17

 E. Motion for a New Trial…………………………...................18

 F. Sentencing and Bail Pending Appeal....................................23

 G. Custody Status…………………………….........................23

IV. SUMMARY OF THE ARGUMENT……………………………..23

VII. STANDARDS OF REVIEW……………………………………26

VIII. ARGUMENT……………………………………………………27

 A. Congress Lacks Authority to Punish the Possession of an Unregistered
  Machine Gun under 26 U.S.C. § 5861(d), a Statute Premised Solely
  on Congress' Article I Power to Tax, Because the Law Is Punitive in
  Nature and it Generates No Tax Revenue……………………….27

  1.  Post-1986 Challenges to 26 U.S.C. §5861(d)……………...34

2. The Affordable Care Act Case……………………………………… 41

3. Section 5861(d) Is Unconstitutional After Sebelius………………46

    a. Section 58619d) Generates No Revenue………………………46

    b. Section 5861(d) Is A Penalty…………………………………..47

    c. Section 5861(d) Is Enforced by ATF………………………… 49

B. Punishing Mr. Bronsozian for possessing an unregistered
machinegun pursuant to 26 U.S.C. § 5861(d) Violates Due Process
Because It Would Have Been Impossible for Him to Comply with
the Law………………………………………………………………….. 50

C. 18 U.S.C. § 922(o) Repealed 26 U.S.C. § 5861(d)…………………… 51

D. The Government Violated Mr. Bronsozian's right to Due Process
when it withheld exculpatory evidence in the possession of John
Carr of the Vagos Outlaw Motorcycle Gang's history and
propensity for violence………………………………………….......52

    1. The Evidence Was Suppressed…………………………………..53

    2. The Evidence Was Favorable to the Defense……………………55

    3. Bronsozian Suffered Prejudice………………………………..61

E. The government violated Mr. Bronsozian's right to Due Process
when it presented testimony by John Carr that falsely minimized
the violent, criminal nature of the Vagos Outlaw Motorcycle Gang…..66

    1. Carr's Testimony was False and Misleading……………………… 68

    2. Bronsozian Suffered Prejudice…………………………………… 69

IX. CONCLUSION…………………………………………………………… 71

# TABLE OF AUTHORITIES

**Cases:**                                                 **Page(s)**

*Amado v. Gonzalez,*
    758 F.3d 1119 (9th Cir. 2014)…………………………………..59

*Bailey v. Drexel Furniture Co.*
    (U.S. Reports Title: Child Labor Tax Case), 259 U.S. 20 (1922)…43

*Brady v. Maryland,*
    373 U.S. 83 (1963) ………………………………..4, 5, 9, 10, 20, 22,
                                     23, 25, 52, 53, 55, 67, 70, 71

*Browning v. Baker,*
    875 F.3d 444 (9th Cir. 2017)……………………………………67

*Carriger v. Stewart,*
    132 F.3d 463 (9th Cir. 1997)(en banc)……………………………53

*Comstock v. Humphries,*
    786 F.3d 701 (9th Cir. 2015)……………………………………55, 60

*DePetris v. Kuykendall,*
    239 F.3d 1057 (9th Cir. 2001)……………………………………65

*Dep't of Revenue of Montana v. Kurth Ranch,*
    511 U.S. 767 (1994)………………………………………………48

*Farmer v. Higgins,*
    907 F.2d 1041 (11th Cir. 1990) ……………………………………42

*Giglio v. United States,*
    405 U.S. 150 (1972)……………………………………………..67, 68

*Haynes v. United States,*
    390 U.S. 85 (1968)……………………………………………32, 34, 50

*Hunter v. United States,*
    73 F.3d 260 (9th Cir. 1996)………7, 8, 22, 39, 40, 41, 43, 45, 50, 51

*In re Bradford,*
        534 B.R. 839 (Bankr. M.D. Ga. 2015)……………………………42

*Jackson v. Brown,*
        513 F.3d 1057 (9th Cir. 2008)………………………………..67

*Kyles v. Whitley,*
        514 U.S. 419 (1995)…………………………………54, 61, 63, 70

*Ledezma-Galicia v. Holder,*
        636 F.3d 1059 (9th Cir. 2010) …………………………………52

*Milke v. Ryan,*
        711 F.3d 998 (9th Cir. 2013)…………………………………55

*Miller v. Gammie,*
        335 F.3d 889 (9th Cir. 2003)…………………………………45

*Miller v. Pate,*
        386 U.S. 1 (1967)…………………………………………..69

*Morris v. Ylst,*
        447 F.3d 735 (9th Cir.2006)…………………………………..68

*Napue v. Illinois,*
        360 U.S. 264 (1959)………………………....20, 21, 67, 68, 69, 70, 71

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
        551 U.S. 644  (2007)…………………………………………51

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*………7, 8, 22, 23, 41, 45, 46, 47, 50
        32 S. Ct. 2566 (2012)

*Nigro v. United States,*
        276 U.S. 332 (1928)………………………………………..28

*Phillips v. Ornoski,*
        673 F.3d 1168 (9th Cir.  2012)…………………………………68

*Posadas v. Nat'l City Bank of New York,*
    296 U.S. 497 (1936)…………………………………………51, 52

*Sonzinsky v. United States,*
    300 U.S. 506 (1937)………………………………………31, 33, 38

*Staples v. United States,*
    511 U.S. 600 (1994)…………………………………………………..46

*Strickler v. Greene,*
    527 U.S. 263 (1999)…………………………………………………..52

*Towery v. Schriro,*
    641 F.3d 300 (9th Cir. 2010)……………………………………69

*United States v. Agurs,*
    427 U.S. 97 (1976)…………………………………………………70

*United States v. Ardoin,*
    19 F.3d 177 (5th Cir. 1994)………………………………………..38

*United States v. Cerna,*
    633 F. Supp. 2d 1053 (N.D. Cal. 2009)…………………………53

*United States v. Constantine,*
    296 U.S. 287 56 S.Ct. 223, 80 L.Ed. 233……………………31, 49

*United States v. Dalton,*
    960 F.2d 121 (10th Cir. 1992)…………...34, 36, 37, 38, 39, 40, 51

*United States v. Ferguson,*
    788 F. Supp. 580 (D.D.C. 1992)………………………………….36

*United States v. Freed,*
    401 U.S. 601 (1971)…………………………………………………33

*United States v. Gambill,*
    912 F. Supp. 287 (S.D. Ohio 1996) aff'd, 129 F.3d 1265
    (6th Cir. 1997)……………………………………………………35, 52

*United States v. Grier,*
     354 F.3d 210 (3rd Cir. 2003)……………………………………38

*United States v. Hanna,*
     55 F.3d 1456 (9th Cir. 1995)……………………………………56

*United States v. James,*
     169 F.3d 1210 (9th Cir. 1999)………………………………..65

*United States v. Jones*,
     976 F.2d 176 (4th Cir. 1992)……………………36, 38, 39, 40, 45

*United States v. Kahriger,*
     345 U.S. 22 (1953)………………………………………………42

*United States v. Kane et al,*
     CR 13-250-JAD-VCF (D. Nevada)………18, 19, 20, 21, 22, 55, 56
                 57, 58, 59, 61, 64, 66, 68, 69, 70

*United States v. Kelly*,
     874 F.3d 1037 (9th Cir. 2017)……………………………………26

*United States v. Kohring,*
     637 F.3d 895 (9th Cir. 2011)……………………………………56

*United States v. Kurt,*
     988 F.2d 73 (9th Cir. 1993)………………………………38, 39, 48

*United States v. McCalla,*
     545 F.3d 750 (9th Cir. 2008)………………………………..26

*United States v. Murillo,*
     255 F.3d 1169 (9th Cir. 2001)……………………………………57

*United States v. Olsen,*
     704 F.3d 1172 (9th Cir. 2013)……………………………………56

*United States v. Price,*
     566 F.3d 900, 908 (9th Cir. 2009)……………………………53, 54

*United States v. Reorganized CF & I Fabricators of Utah, Inc.,*
    518 U.S. 213 (1996)……………………………………………………43

*United States v. Reveles-Espinoza,*
    522 F.3d 1044 (9th Cir. 2008)…………………………………………26

*United States v. Rock Island Armory, Inc.,*
    773 F. Supp. 117 (C.D. Ill. 1991)……………………………………36

*United States v. Rodriguez,*
    766 F.3d 970 (9th Cir. 2014)…………………………………………..27

*United States v. Ross,*
    458 F.2d 1144 (5th Cir.1972)…………………………………………..42

*United States v. Sedaghaty,*
    728 F.3d 885 (9th Cir.2013)…………………………………………26

*United States v. Stever,*
    603 F.3d 747 (9th Cir. 2010)…………………………………………..57

*United States v. Vera,*
    770 F.3d 1232 (9th Cir. 2014)………………………………………….57

## **Statutes:**

Article I, § 8, cl. 1, United States Constitution……………..1, 3, 23, 27, 28
                            ………..30, 35, 38, 41, 45, 50

Firearm Owner's Protection Act ("FOPA") in 1986…………….33, 37, 38

Gun Control Act of 1968, Pub. L. 90-618 (October 22, 1968)…………33

Internal Revenue Code, I.R.C. Ch. 53 § 5801 et seq……………………27

UNITED STATES STATUTES AT LARGE, 63 Cong. Ch. 1, December 17,
1914, 38 Stat. 785……………………………………………………28

27 C.F.R. § 479.105……………………………………………………..34

18 U.S.C. § 922(o)…………………………………1, 3, 7, 23, 24, 33, 34,
35, 36, 37, 46, 51, 52

18 U.S.C. § 3231……………………………………………………….4

18 U.S.C. § 3742……………………………………………………….6

26 U.S.C. § 5822……………………………………………37, 40, 46

26 U.S.C.A. § 5861……………………………………………………46

26 U.S.C. § 5861(c)………………………………………………..37, 40

26 U.S.C. § 5861(d)………………………...1, 3, 4, 6, 7, 8, 24, 27, 34, 37, 38
38, 40, 45, 46, 47, 48, 49, 50, 51, 52, 70

26 U.S.C. § 5861(e)……………………………………………………..37

26 U.S.C. § 5861(j)……………………………………………………...37

28 U.S.C. § 1291………………………………………………………..6

## **Publications:**

Rept. No. 1780, Committee on Ways and Means, U.S. House of
Representatives, 73rd Cong., 2d Sess. 2 (1934); Rept.
No. 1444, Committee on Finance, U.S. Senate, 73rd
Cong., 2d Sess. 1 (1934)………………………………..29

National Firearms Act Handbook, chapter 1, p. 1, U.S. Dept. of
Justice, Bureau of Alcohol, Tobacco Firearms and Explosives,
Office of Enforcement Program Services, ATF E–Publication
5320.8, http:// www.atf.gov/publications/firearms/nfa-
handbook/ (Revised April 2009) (viewed October 5, 2016)….27, 30, 33

National Firearms Act: Hearings Before the House Committee on
Ways and Means, 73rd Cong., 2d Sess., 8 (1934)……………28, 29, 30

U.S. Attorneys' Manual 9-63.516 Charging Machinegun Offenses Under 18 U.S.C. S 922(o), Instead of Under the National Firearms Act, 1999 WL 33219894, at *……………………………..46

W. LaFave & A. Scott, Jr., Substantive Criminal Law § 3.3(c) at 291 (1986)………………………………………………………35

# I.  INTRODUCTION

Nerses Bronsozian was prosecuted under 26 U.S.C. § 5861(d), a statute that was originally justified under Congress' power to levy taxes pursuant to U.S. Const. Art. I, §8, cl. 1.  But Section 5861(d) cannot support a criminal conviction in this case for three reasons.   First, because it is a tax measure, the law has no validity unless it is capable of raising revenue.  Because the government refuses to accept registration or taxes for the possession of machineguns like the one in this case, the statute generates no revenue and therefore exceeds Congress' authority under Article I.  Second, it would violate the Due Process Clause to punish Bronsozian for possessing an unregistered machinegun because it would have been impossible for him to comply with the law by registering his gun.  Third, because 18 U.S.C. § 922(o) bans the possession of all machineguns, it repealed 26 U.S.C. § 5861(d). As a result, the indictment should be dismissed.

Bronsozian's trial was also fundamentally unfair because the government withheld material exculpatory evidence and presented false and misleading testimony.  The sole disputed issue

1

at trial was whether Bronsozian knew that the gun he possessed
was fully automatic. Bronsozian stated that the gun was
automatic, even though he did not know whether that was true,
because he was pressured to say so by the informant. Bronsozian
did as the informant instructed because he knew that the
informant had a history of violence and was a member of the
Vagos Outlaw Motorcycle Gang ("Vagos."). The government's
main witness, Special Agent John Carr of the Bureau of Alcohol,
Tobacco and Firearms ("ATF"), had extensive experience with the
Vagos. Carr was noticed as an expert in a prior case to testify
about the propensity of the Vagos to engage in violence against
members of the public that they perceived as disrespectful. His
opinion was based, in part, on his work with the informant in this
case.

The government knew that Bronsozian's defense depended
on establishing that Bronsozian feared the informant as a result of
his affiliation with the Vagos. But it did not produce Carr's prior
statements to the defense. When Carr was questioned by the
defense about the violence and criminality of the Vagos, he said

nothing about his prior statements and gave misleading answers that minimized the dangerousness of the Vagos. The government's failure to produce Carr's prior statements, and Carr's misleading testimony about the Vagos combined to deprive Bronsozian of his right to a fair trial.

## II. ISSUES PRESENTED

1. 18 U.S.C. § 5861(d), which punishes the possession of an unregistered machinegun, was authorized solely by Congress's power to levy taxes under U.S. Const. Article I, § 8, cl. 1. The government now refuses to register or collect taxes on machineguns. Does Congress have the constitutional authority to punish the possession of an unregistered machinegun, where it is impossible to register a machinegun, the statute imposes only criminal penalties for failure to register, and the law generates no tax revenue?

2. Since May 19, 1986, the government has refused to register previously possessed machineguns pursuant to 18 U.S.C. § 5861(d). Can Mr. Bronsozian be punished for possessing a machinegun that was impossible for him to register?

3.  Did 18 U.S.C. § 922(o), which bans the possession of *all* machineguns, implicitly repeal 26 U.S.C. § 5861(d), which bans the possession of unregistered machineguns?

4.  Bronsozian did not know that the gun he possessed was fully automatic, but nonetheless made statements describing it as fully automatic because he was instructed to do so by the confidential informant, a member of the Vagos. Bronsozian did as he was told because he feared retaliation based on the informant's affiliation with the Vagos. The government's key witness, ATF Special Agent John Carr, was an expert on the Vagos. He stated in a previous case that the Vagos "enforce the authority of the gang by conspiring to direct attacks against . . . members of the public who might defy or unwittingly come into contact with the Vagos in a way that might be deemed 'disrespectful' to the organization." Carr further stated that "[p]ersons in conflict with or who might be perceived to have shown disrespect to the gang may be beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot." Despite multiple

*Brady* requests from the defense, the government never produced Carr's statements. Did the government violate Mr. Bronsozian's right to Due Process under *Brady v. Maryland*?

5. In contrast to his prior statements describing the Vagos as a violent outlaw gang with a propensity to attack or kill members of the public, Special Agent Carr testified at Bronsozian's trial that the Vagos were not necessarily a criminal organization, that prospective members were not required to commit acts of violence, and he knew that a lot of them were not involved in crime or drugs. Did Special Agent Carr's false and misleading testimony about the Vagos violate Bronsozian's right to Due Process under *Napue*?

## III. STATEMENT RE: ADDENDUM

In accord with Ninth Circuit Rule 28-2.7, pertinent constitutional provisions, treaties, statutes, ordinances, regulations, sentencing guidelines, and rules are set forth in the addendum, Appendix A, attached to this brief.

## IV. STATEMENT OF THE CASE

This appeal is from a judgment rendered by the Honorable Stephen Wilson, United States District Court Judge, on May 22,

2017 sentencing appellant to the custody of the Bureau of Prisons for a term of one year and one day. ER 1.[1]

Judgment was entered on May 22, 2017 and appellant filed a timely notice of appeal on May 26, 2017. ER 1, ER 18. The district court had jurisdiction under 18 U.S.C. § 3231. This court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## V. STATEMENT OF FACTS

### A. Course of Proceedings

Appellant Nerses Bronsozian was charged by indictment filed March 29, 2016 with one count of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d). Mr. Bronsozian entered a plea of not guilty. CR 15.[2] Jury trial was set for November 15, 2016 before Judge Wilson. CR 22.

### B. Motion to Dismiss The Indictment

Mr. Bronsozian moved to dismiss the indictment on the ground that (1) Congress did not have authority to impose

---

[1] "ER" will be used throughout this brief to reference the corresponding page number(s) in Appellant's Excerpts of Record Volume 1 and Volume 2.

[2] "CR" will be used throughout this brief to reference the corresponding district court docket entry *USA v. Bronsozian* Case No. 2:16-cr-00196-SVW/

criminal penalties for the possession of unregistered machineguns under 26 U.S.C. § 5861(d), a tax statute, because the law generated no tax revenue and was enforced only as a punitive measure, (2) enforcing the statute violated Mr. Bronsozian's right to Due Process of Law because it was impossible to register his machinegun in accordance with the law, and (3) that § 5861(d), which punished the possession of unregistered machineguns, was repealed by 18 U.S.C. § 922(o), which banned possession of all machineguns CR 63. The Court denied the motion. ER 12. The Court held that it was bound by this Court's *per curiam* decision in *Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996), and rejected Mr. Bronsozian's argument that the Supreme Court's decision in *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012) undermined *Hunter*, finding that the cases were not "irreconcilable." *Id*. at 6. The district court noted, however, that this Court "may ultimately decide to overturn its holding in *Hunter*, either because it wishes to reconsider its previous adoption of the Fourth Circuit's reasoning in *Jones* or because it

finds that the *Sebelius* holding has invalidated the constitutional justification of § 5861(d) . . . ." *Id.*

### C.    Motions Related to The Informant

On October 25, 2016, Bronsozian moved for discovery regarding the identity of the government's confidential informant. ER 300.  Although Mr. Bronsozian did not know the informant's full name, he knew that the informant was a member of the Vagos and believed that in order to obtain such membership the informant would have had to commit violent or intimidating acts on behalf of the gang. *Id.*  The defense sought more information about the informant to support its theory that Mr. Bronsozian stated that his gun was a machinegun, even though he did not know whether that was true, because of pressure from the informant.  The informant's affiliation with the Vagos was relevant to the defense because it explained by Mr. Bronsozian feared the informant and did as he said.

The defense repeatedly put the government on notice prior to trial that it would argue that Bronsozian was intimidated by the informant because of involvement with the Vagos.  In a brief filed

November 4, 2016, the defense urged the government to

investigate and produce evidence regarding the violent nature of

the Vagos OMG by inquiring specifically of Special Agent Carr.

> Defense investigation also suggests that the informant
> was a "full-patch" member of the Vagos motorcycle
> gang, and that in order to be validated as such the
> informant would have had to commit violent and/or
> intimidating acts on behalf of the gang. If the
> government has any information that corroborates
> these facts then it must reveal it to the defense, as it
> would be relevant to establish why Mr. Bronsozian
> would have been persuaded to say what the informant
> told him to say. The government has an affirmative
> obligation to gather all potential impeachment
> material from S.A. Carr and any other agent that may
> have been a handler or supervisor of the informant.

ER 298.  At a hearing held on November 7, 2016, the defense

reiterated that Carr was in a unique position to provide

information about the violent nature of the Vagos OMG and the

informant's role in the gang:

> [F]or purposes of *Brady*, the government needs to be
> put on notice of what I think it may have in its
> possession. I believe this informant has worked with
> Special Agent John Carr for many years; I believe this
> informant is a member of the Vagos Motorcycle Gang,
> which is a very violent gang involved in organized
> crime and heavy drug use, and that he is what's called
> a, quote, full patch member, and in order to become a
> full patch member of the Vagos Motorcycle Gang, one is
> required to actually intimidate and hurt people on

> behalf of the gang. I think Special Agent Carr is
> intimately familiar with that gang and how it operates,
> and that he is aware of those facts about the informant.
> That would all be *Brady* to the extent that it operated
> to intimidate Mr. Bronsozian or make him more likely
> to do what the informant asked him to do.

ER 290. The Court said "you made your record; the response is up

to the government. They have to consider what is within the

realm of *Brady* or not, but you've made your record." ER 291.

On November 9, 2016, the Court granted the motion to

disclose the identity of the informant and ordered the government

to reveal the informant's identity and provide discovery related to

him, noting that "a central issue in this case will be whether the

Defendant knew at the time he possessed the gun that it was a

fully automatic machinegun, and the government will have to

prove that fact beyond a reasonable doubt." *Id.* ER 287.

On November 10, 2016, the government interviewed the

informant, who admitted that he was a prospective member for the

Vagos in 2011, and that he later became a member. *See* ER 276.

On November 11, 2016, the government moved for an order

excluding evidence at trial of the informant's gang affiliation on

the ground that it was irrelevant CR 51.

On November 15, 2016, the Court denied the government's motion to exclude evidence of the informant's gang affiliation, noting that "the fact that the defendant may have been aware or was aware of the fact that this informant was a gang member and perhaps even that he was trying to prove himself could have some circumstantial relevance to his state of mind." ER 222.

## D.   Trial

Trial commenced on November 15, 2016.

### The Government's Case

The key witness for the government was Special Agent John Carr.  Carr was a 26-year veteran of the ATF. ER 143.

Carr testified that he had an informant who had been in touch with Mr. Bronsozian about purchasing guns.  ER 154. On July 7, 2011, at the informant's direction, Mr. Bronsozian came to a warehouse equipped with recording devices.  He was accompanied by Albert Kakish.  *Id*.  Carr purchased two guns from Mr. Bronsozian – a MAC-10 and a Galil. ER 156.  Mr. Bronsozian said that the Galil was a semi-automatic, and that the MAC-10 was fully automatic. ER 158.

On cross-examination, the defense questioned Special Agent Carr about the Vagos and the informant's role in the gang. Carr acknowledged that the informant was a "prospective" member of the Vagos gang at the time of the investigation. ER 194. He also identified the distinctive Vagos colors and symbols worn by the informant. ER 155; 278-279. When asked whether one must engage in violence on behalf of the Vagos in order to obtain full membership in the gang, Carr denied it. Carr stated that he had "heard a lot of guys that never have no criminal issues, committing no crimes." ER 197-198. When asked whether he knew of people who had committed acts of violence to get their patch, Carr answered vaguely – "In any organization, sir, there are guys that are criminals and there's some that are not." He was similarly vague when asked whether the Vagos were a criminal organization. He testified that while law enforcement sees the Vagos that way, the public does not. *Id.*

When asked whether he had witnessed Vagos members committing crimes, Carr said he didn't know whether he had. When pressed for a more specific answer, the government objected

and the court sustained it. ER 199. Carr then reiterated his earlier testimony that there are "a lot of guys that get in the Vagos that don't commit crimes" and that "don't use drugs." *Id*. Defense counsel then asked whether, during the course of his career, Carr had learned of acts of violence committed by the Vagos in order to obtain membership. ER 200. The Court sustained another government objection. *Id*.

Max Kingery, an ATF firearms expert, testified for the government. Mr. Kingery had tested at least 2,000 machine guns prior to his testimony in this case. ER 112. He acknowledged that the weapon in this case was originally manufactured as a closed-bolt semi-automatic weapon. ER 126. He testified that the gun was subsequently converted to function as a fully automatic, open-bolt machinegun. ER 131. Mr. Kingery could not determine when it was converted or by whom. *Id*. However, the process of converting the weapon would have been difficult and would have required removing all of the interior parts of the gun, including some that were welded into the receiver, and moving the trigger pin about two tenths of an inch. ER 133-135.

Mr. Kingery was able to determine that the gun was a fully automatic machine because he disassembled it and examined its internal parts. ER 127. He also determined that it was fully automatic by "cycling the bolt" of the gun. ER 126. Finally, Mr. Kingery test-fired the gun at a firing range, and found that it expelled more than one shot per trigger pull. ER 119.

ATF Specialist Robert Howard testified that he had conducted a diligent search to determine whether the gun possessed by Mr. Bronsozian had been registered in the National Firearms Registration and Transfer Record ("NFRTR"), the database maintained for firearms governed by the National Firearms Act. ER 106. He testified that it was not. *Id.* He acknowledged that if Mr. Bronsozian had attempted to register the gun, he would not have been permitted to do so. He clarified that the machine gun would be "922[o] restricted." ER 109. He explained that "Individuals could not register a machine gun that was manufactured after May 19, 1986." ER 109-110.

Special Agent Eugene Hwang of the United States Marshals Service testified that when Mr. Bronsozian was arrested and

interrogated in 2016, he denied knowing that the MAC-10 was a fully automatic weapon. ER 266. After Special Agent Hwang threatened to tell the prosecutor that he was lying, Mr. Bronsozian stated that the gun came with two pieces, and that one of the pieces could convert the gun into a full automatic. ER 271. Mr. Bronsozian did not admit that the gun, as it was configured when he sold it, was a fully automatic weapon.

**The Defense Case**

The only defense witness was Albert Kakish, a long-time friend of Mr. Bronsozian who was present during the gun transaction. ER 239. Kakish was also acquainted with the confidential informant, who he knew as "Pete." ER 238-239. Kakish testified that Pete was a dangerous and intimidating person. *See* ER 236-240. Mr. Kakish had seen members of the Vagos engage in violence and crime, including drug trafficking, fighting, robbery and theft. ER 236. He recounted one instance in which the informant robbed another man for methamphetamine, and another incident in which he slapped a guy. ER 238. He and Bronsozian had discussed these incidents. *Id*.

Kakish testified that he overheard a conversation between the informant and Mr. Bronsozian in 2011. The informant approached Mr. Bronsozian and asked him "I heard you had a few guns, you know. Do you want to sell me a few guns? ER 239-240. After Mr. Bronsozian's initial response[3] the informant "got a little aggressive" and became more intimidating. He said "[w]ell, if you don't want to sell the guns, you know, the club is not going to be too happy about this." ER 242.

Kakish said that the informant told Mr. Bronsozian to make sure to say that the gun was a fully automatic, because "that was what the guy is looking for, and we can make some money out of this." ER 243. The informant asked Mr. Bronsozian whether the gun was fully automatic, and Mr. Bronsozian responded. ER 244. The Court did not permit evidence of Mr. Bronsozian's response to

---

[3] Mr. Bronsozian's response to the informant was that he didn't want to sell the guns. ER 240. The Court sustained the prosecutor's objection to that portion of Mr. Kakish's testimony.

16

the informant.[4]  The informant emphasized that Mr. Bronsozian

should "make sure [to] let the guy know it's a fully automatic."  *Id.*

**Jury Deliberation**

The jury retired to deliberate but returned with a note

inquiring whether "the bolt that makes the MAC-10 perform as a

fully automatic weapon illegal to possess."  ER 224.  The Court

instructed the jury that the answer was "no" and re-read the

instruction defining "machine gun."  ER 228. The jury returned

with a guilty verdict. *Id.*

### E.    Motion for a New Trial

After trial, the defense discovered that in 2015, Special

Agent Carr had been noticed by the government as an expert on

outlaw motorcycle gangs in the District of Nevada.

According to a "Statement of Qualifications" submitted to

the Court as part of that case, Special Agent Carr stated:

> During the last seventeen years, one of my primary
> duties has been the investigation of criminal activity by
> outlaw motorcycle gang members. I have been the case
> agent on five separate investigations of outlaw

---

[4]    Had Kakish been permitted to relay Bronsozian's response, he would
have said that Bronsozian stated "I don't know, I've never shot them."  ER
275.

motorcycle gangs. As part of these investigations, I have utilized confidential informants and undercover agents who became and were members of outlaw motorcycle gangs. I have also interviewed motorcycle gang members, ex-gang members, their wives, girlfriends, and associates. I have conducted numerous hours of undercover activity with outlaw motorcycle gang members, and have successfully performed undercover operations with two separate documented outlaw motorcycle gangs to include becoming a "full patched" member of an outlaw motorcycle gang and operating in an undercover capacity for a period of three years. In addition, I have instructed at and attended national and international seminars regarding outlaw motorcycle gangs.

ER 102 (*United States v. Kane et al*, CR 13-250-JAD-VCF (D.

Nevada) Dkt. No. 124-1).

The government stated that Carr would testify "as an expert in relation to motorcycle gangs and their propensity to commit acts of violence on behalf of the club." ER 96 (*United States v. Kane*, CR 13-250-JAD-VCF, Dkt. No. 124). Carr was noticed to testify specifically about the Vagos gang:

Vagos gang members also enforce the authority of the gang by conspiring to direct attacks against rival motorcycle gangs, such as the "Hells Angels," the "POBOBs" and the "Bandidos," as well as members of the public who might defy or unwittingly come into contact with the Vagos in a way that might be deemed 'disrespectful' to the organization.

18

> *Persons in conflict with or who might be perceived to*
> *have shown disrespect to the gang may be beaten*
> *severely or even killed by being kicked repeatedly with*
> *steel-toed boots, stabbed, or shot.*

ER 98 (emphasis added).

At a hearing in February 2016, SA Carr testified about the role of a Vagos "prospect." ER 88 (*United States v. Kane*, CR 13-250-JAD-VCF, Dkt. No. 190). "[A]s a prospect member, you're trying to show your worthiness to the organization; that you're willin' to do whatever it takes to become a member. So, you know, if you want to become a member, you do what you're asked to do basically." *Id.* He also described the role of "sergeant-at-arms" for the Vagos as the "enforcer, so to speak, of the chapter." The sergeant-at-arms is "in charge of the supervision or punishment of the other members of the chapter." ER 82. He clarified that the punishment included beatings. ER 84. Carr stated that in 2013 he had an investigation into the Vagos OMG in which he used an

"informant who was a full-patch member who was a sergeant-at-arms of his Chapter."  ER 76.[5]

On January 27, 2017, Mr. Bronsozian moved for a new trial based on the government's withholding of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), and its presentation of false evidence under *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Mr. Bronsozian argued that Special Agent Carr had falsely denied or minimized the violent tendencies of the Vagos, and that the government had suppressed evidence of the Vagos' violent propensity, including Special Agent Carr's proposed testimony in *Kane*, which was set to occur less than a year before.

On April 17, 2017, the Court held a hearing to permit Special Agent John Carr to explain his statements in *Kane*. CR 19. Carr confirmed that all the statements in the notice of expert testimony in *Kane* were true, including:

- that the Vagos issue incentives that honor their membership that do commit acts of violence for the gang, ER 37;

---

[5]  Carr's testimony that the informant in this case was a prospect for the Vagos at the time of the gun transaction in 2011 suggests that the informant Carr described in his February 2016 testimony in *Kane* was the same person.

- that people who are in conflict with the Vagos or who might be perceived to show disrespect for the gang may be beaten severely or even killed by being kicked repeatedly by steel-toed boots, ER 39-40;

- that Vagos direct attacks against witnesses who are willing to cooperate with law enforcement, ER 43;

- that the Vagos pay to represent people who commit crimes on behalf of the gang, ER 43;

- that prospective members ("prospects") are expected to commit crimes on behalf of the gang when they're directed to do so by their superiors, ER 44;

- that prospects are often assigned to store weapons and narcotics for the gang, ER 45; and

- that the Vagos leadership controls the activities of its members and enforces internal discipline by threatening and assaulting its own members, ER 46-47.

Special Agent Carr testified that neither of the United States Attorneys in this case told him that defense counsel had asked for information regarding his knowledge about the Vagos and their propensity for violence. ER 49. Carr did not tell the prosecutors in this case about his testimony in *Kane*. ER 50.

On April 19, 2017, the Court denied the motion. On the *Napue* question, Court found that Carr's testimony in Mr. Bronsozian's trial did not contradict his statements in *Kane*. ER 9. The Court reasoned that the defense questioned Carr only about "whether a prospective Vagos member was actually *required*

to perform acts of violence on behalf of the club in order to become a full member." *Id*. (emphasis in original). Carr's response was not false or misleading, the Court held, because there was an "important distinction between holding violence in high esteem and requiring acts of violence before allowing prospects to become full members." *Id*.

On the *Brady* question, the Court held that Carr's testimony in *Kane* was not "exculpatory or impeachment evidence." ER 10. The Court reasoned that Carr's "specific knowledge or observations of the Vagos'[] violent tendencies were not directly relevant to the defense's theory because the defense needed to present testimony regarding the Defendant's own knowledge of the Vagos, not SA Carr's knowledge." *Id*. The Court acknowledged that Bronsozian had presented evidence of his own knowledge of the Vagos' reputation for violence through the testimony of defense witness Albert Kakish, but held that Carr's testimony in *Kane* would not have corroborated Bronsozian's fear because it concerned the *actual* propensity of the Vagos for violence, and not Bronsozian's fear of that violence. *Id.*

Accordingly, it was "not the type of evidence that the government would need to turn over under *Brady* . . . ." *Id.*

## F.    Sentencing and Bail Pending Appeal

On May 22, 2017 the Court sentenced Mr. Bronsozian to one year and one day in custody, followed by three years of supervised release.  ER 1.    On June 29, 2017, the Court granted Mr. Bronsozian bail pending appeal.  CR 133.

## G.    Custody Status

Mr. Bronsozian is not in custody, having been granted bail pending appeal by the trial court.  CR 133.

## VI.  SUMMARY OF ARGUMENT

Although the National Firearms Act has a clearly punitive focus, it is authorized solely by Congress' power under Article I, Section 8, clause 1 of the Constitution to lay and collect taxes. But as of May 19, 1986, Congress banned the possession of all machineguns pursuant to 18 U.S.C. § 922(o).  As a result, the government will no longer accept applications to register and pay applicable taxes on machineguns.  Therefore, as applied to machineguns possessed after May 19, 1986, including the MAC-10 that Bronsozian was accused of possessing, the statute has no

potential to generate revenue. Although this Court rejected the argument that §5861(d) was unconstitutional as applied to machineguns its *per curiam* decision in *Hunter*, 73 F.3d at 262, the Supreme Court's decision in *Sebelius*, 132 S. Ct. 2566 fundamentally undercut and effectively overruled *Hunter*. Under *Sebelius*, the statute cannot be justified as a tax measure, and therefore it has lost its constitutional justification. Alternatively, applying 26 U.S.C. § 5861(d) in this case would violate the Due Process clause because it was impossible for Bronsozian to comply with the law. Finally, 18 U.S.C. § 922(o), which bans the possession of all machineguns, implicitly repealed 26 U.S.C. § 5861(d), which bans the possession of unregistered machineguns.

The lone disputed issue at trial was whether Bronsozian knew that the MAC-10 was fully automatic. The gun had originally been manufactured as a semi-automatic and the markings on the outside of the gun were consistent with a semi-automatic. There is no evidence that Bronsozian ever used or shot the gun. The only evidence that Bronsozian knew that the gun was fully automatic were his statements to the undercover agent

and the informant. Bronsozian's sole defense was that he made those statements, even though he did not know whether the MAC-10 was fully automatic, because the informant, who was a member of the Vagos Outlaw Motorcycle Gang, told him that that was what the buyer wanted. Bronsozian did as he was told because he feared the informant, both as a result of his affiliation with the Vagos, which he understood to be a violent outlaw gang, and as a result of what he had heard about past violence by the informant.

Special Agent John Carr, the government's key witness, had extensive experience infiltrating the Vagos and had testified as an expert about the gang. Prior to Bronsozian's trial, Carr was noticed as an expert in another case to testify about the propensity of Vagos members to commit acts of violence on behalf of the club. As part of his proposed testimony Carr made several statements that corroborated Bronsozian's fear of the informant, including that the Vagos are known to beat or kill members of the public who are perceived to be disrespectful to the organization. Those statements were never produced to the defense. Moreover, when Carr was questioned about the Vagos he gave misleading

testimony that falsely minimized the dangerousness of the Vagos and left the jury with the misimpression that the Vagos were neither a dangerous nor necessarily a criminal organization. As a result of the government's withholding of Carr's prior statements and Carr's false and misleading testimony, the jury was left with little evidence to support Bronsozian's sole defense.

## VII. STANDARDS OF REVIEW

This Court reviews the district court's denial of Bronsozian's motion to dismiss the indictment on constitutional grounds *de novo*. *United States v. McCalla*, 545 F.3d 750, 753 (9th Cir. 2008). It reviews the denial of Bronsozian's motion to dismiss the indictment based on a Due Process violation *de novo*. *United States v. Reveles-Espinoza*, 522 F.3d 1044, 1047 (9th Cir. 2008). The Court reviews whether to dismiss a charge in an indictment based on its interpretation of a federal statute *de novo*. *See United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017).

The denial of a new trial motion based on a *Brady* violation is reviewed *de novo*. *United States v. Sedaghaty,* 728 F.3d 885, 899 (9th Cir.2013). Findings of fact underlying the denial of a new

trial are reviewed for abuse of discretion. *Id.* The denial of a new

trial motion based on *Napue* error is also reviewed *de novo*.

*United States v. Rodriguez*, 766 F.3d 970, 980 (9th Cir. 2014).

## VIII. ARGUMENT

**A.  Congress Lacks Authority to Punish the Possession of an Unregistered Machine Gun under 26 U.S.C. § 5861(d), a Statute Premised Solely on Congress' Article I Power to Tax, Because the Law Is Punitive in Nature and it Generates No Tax Revenue**

The National Firearms Act (NFA), codified under the

Internal Revenue Code, I.R.C. Ch. 53 § 5801 et seq. was enacted

June 26, 1934.  Although the NFA was enacted by Congress based

on its constitutional authority to levy taxes, the true purpose of

the law was unrelated to revenue collection.[6]  The bill was a

response to the "gangland" crimes of that era, including the

notorious St. Valentine's Day massacre.  The NFA was intended to

"curtail, if not prohibit" transactions involving particularly

dangerous weapons that were used primarily by criminals.  *Id.*

---

[6] *National Firearms Act Handbook,* chapter 1, p. 1, U.S. Dept. of Justice, Bureau of Alcohol, Tobacco Firearms and Explosives, Office of Enforcement Program Services, ATF E–Publication 5320.8, http://www.atf.gov/publications/firearms/nfa-handbook (Revised April 2009) (viewed February 23, 2018).

However, as Attorney General Homer S. Cummings explained in hearings leading up to the 1934 bill, "[w]e have no inherent police power to go into certain localities and deal with local crime." National Firearms Act: *Hearings Before the House Committee on Ways and Means*, 73rd Cong., 2d Sess., 8 (1934). Congress' means of achieving these goals were to follow the formula of the Harrison Narcotics Tax Act of 1914, which imposed restrictions on the sale and distribution of opium and coca leaves through Congress' power to tax. UNITED STATES STATUTES AT LARGE, 63 Cong. Ch. 1, December 17, 1914, 38 Stat. 785.

Article I, § 8, cl. 1 of the Constitution provides: "The Congress shall have power to lay and collect taxes, duties, imposts, and excises. . . ." Upholding the Narcotics Act in *Nigro v. United States,* 276 U.S. 332 (1928), the Court stated:

> In interpreting the act, we must assume
> that it is a taxing measure, for otherwise it
> would be no law at all. If it is a mere act for
> the purpose of regulating and restraining
> the purchase of the opiate and other drugs,
> it is beyond the power of Congress and must
> be regarded as invalid...."

28

*Id.* at 341. Accordingly, both the House Ways and Means Committee Report and the Senate Finance Committee Report justified the basis for the NFA using the same wording: "In general this bill follows the plan of the Harrison Anti–Narcotic Act and adopts the constitutional principle supporting that act in providing for the taxation of fire-arms and for procedure under which the tax is to be collected." Rept. No. 1780, Committee on Ways and Means, U.S. House of Representatives, 73rd Cong., 2d Sess. 2 (1934); Rept. No. 1444, Committee on Finance, U.S. Senate, 73rd Cong., 2d Sess. 1 (1934).

The constitutional rationale of the 73rd Congress is also revealed by a discussion during the Ways and Means Committee's hearing on the National Firearms Act in which Congressman Sumners asked, "This is a revenue measure and you have to make it possible at least in theory for these things to move in order to get internal revenue?" to which Attorney General Cummings replied, "That is the answer exactly." National Firearms Act: *Hearings Before the House Committee on Ways and Means*, 73rd Cong., 2d Sess., 8 (1934). Attorney General Cummings went on to

say, "If we had a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say, "we will tax the machine gun … you are easily within the law." *Id.* at 19.

Relying on the power to raise revenue enumerated in article I, the NFA imposed a tax of $200 on the making and transferring of firearms as well as a special occupational tax on anyone engaging in the business of importing, manufacturing or dealing in NFA firearms. *National Firearms Act Handbook, supra.* "Firearms" as that term was defined in 1934 "included shotguns and rifles having barrels less than 18 inches in length, certain firearms described as "any other weapons" [meaning concealable pistols such as a pen, knife, or umbrella gun], machine guns, and firearm mufflers and silencers." *Id.* In order to facilitate this tax and ensure that it was collected with each transfer, the NFA required that any person transferring NFA firearms or possessing an unregistered firearm must register them with the Secretary of the Treasury, who would proceed to collect the duty. *Id.* It

provided for criminal sanctions for those who did not follow the registration requirements.  26 U.S.C.A. § 5861.

The NFA was first challenged in *Sonzinsky v. United States*, 300 U.S. 506, 512 (1937).  The defendant claimed that its "levy is not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms…."  The Supreme Court found that on its face, the NFA was a revenue measure:

> The case is not one where the statute contains regulatory provisions related to a purported tax in such a way as has enabled this Court to say in other cases that the latter is a penalty resorted to as a means of enforcing the regulations…. Nor is the subject of the tax described or treated as criminal by the taxing statute. *Compare United States v. Constantine*, 296 U.S. 287, 56 S.Ct. 223, 80 L.Ed. 233. Here section 2 contains no regulation other than the mere registration provisions, which are obviously supportable as in aid of a revenue purpose. On its face it is only a taxing measure….

*Id.* at 513.  Because the statute generated some revenue, the Court refused to look beyond the stated purpose of the act or to evaluate the motives behind it:

> Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of the courts.... They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution....

> Here the annual tax of $200 is productive of some revenue. We are not free to speculate as to the motives which moved Congress to impose it, or as to the extent to which it may operate to restrict the activities taxed. As it is not attended by an offensive regulation, and since it operates as a tax, it is within the national taxing power.

*Id.* at 513-514. The NFA was challenged again in *Haynes v. United States,* 390 U.S. 85, 88 (1968), this time on the basis that it violated gun owners' right against self-incrimination because registration information could be passed on to state authorities who could then prosecute gun owners under state weapons laws. The Court noted throughout the opinion that the NFA was justified on its face as a means to collect taxes:

- The National Firearms Act is "an interrelated statutory system for the taxation of certain firearms." *Id.* at 87

- "All these taxes are supplemented by comprehensive requirements calculated to assure their collection…every person possessing such a firearm is obliged to register his possession with the Secretary…." *Id.* at 88-89.

- Citing to *Sonzinsky*, "We do not doubt, as we have repeatedly indicated, that this Court must give deference to Congress's *taxing powers*, and to measures reasonably incidental to their exercise…." *Id.* (emphasis added).

The NFA was amended by Title II of the Gun Control Act ("GCA"). Gun Control Act of 1968, Pub. L. 90-618 (October 22, 1968). The GCA did away with the requirement that gun owners register their unregistered firearms, yet it maintained the illegality of possessing an unregistered firearm. 26 U.S.C. § 5861; *see also United States v. Freed*, 401 U.S. 601 (1971). There was no mechanism to register a previously unregistered NFA firearm. *See National Firearms Act Handbook*, *supra* at 24.

The NFA was then expanded once more with the Firearm Owner's Protection Act ("FOPA") in 1986. *Id.* FOPA amended the Gun Control Act so that under 18 U.S.C.A. § 922(o), the GCA prohibits the transfer or possession of *any* machine gun that was not previously registered as of May 19, 1986. *Id.* Since the

passage of 18 U.S.C.A. § 922(o), the ATF will not accept applications to transfer, register, or pay the $200 tax on any machine gun that was not previously registered as of May 19, 1986. 27 C.F.R. § 479.105.

### 1.    Post-1986 challenges to 26 U.S.C. §5861(d)

The Tenth Circuit has held that 26 U.S.C. § 5861(d) cannot be enforced with respect to machineguns possessed after 1986. *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992). In *Dalton*, an attorney accepted a firearm from his client in lieu of a fee for his services. The client had converted the firearm into a machinegun in 1989. Dalton was convicted with a violation of 26 U.S.C. § 5861(d) and (e). The Tenth Circuit reversed the convictions on two grounds. First, it held that it was a violation of due process to punish the defendant for failing to perform an act – the registration of a firearm that had been modified into a machinegun in 1989 – that was impossible for him to perform. The Court reasoned that the gravamen of the offense was not the mere possession of a machinegun, but the possession of an *unregistered* machinegun. *Dalton*, 960 F.2d at 123 (*citing Haynes*,

34

390 U.S. at 93) ("[T]he possession of a firearm and a failure to register are equally fundamental ingredients.").  Because the defendant could not have registered the machinegun at the time he possessed it, the court found that the application of the law to him was fundamentally unfair.  *Id.* at 124 (*citing* 1 W. LaFave & A. Scott, Jr., *Substantive Criminal Law* § 3.3(c) at 291 (1986) ("one cannot be criminally liable for failing to do an act which he is physically incapable of performing").  Second, the Court held that the statute was invalid because it was not within Congress' enumerated power to lay and collect taxes under Article I, § 8 cl 1.  Although the statute originally was a valid tax measure because it generated revenue when passed, it could no longer be justified as to machineguns possessed after 1986 because the government refused to accept registration or tax payments for them.  *Id.* at 124-25 ("[B]ecause the registration requirements of the National Firearms Act were passed pursuant to the taxing power, and because after the enactment of section 922(o) the government will no longer register or tax machineguns, section 922(o) has 'removed the constitutional legitimacy of registration as an aid to

taxation.'"); *Id.* at 125 ("To put the proposition as plainly as we are able: a provision which is passed as an exercise of the taxing power no longer has that constitutional basis when Congress decrees that the subject of that provision can no longer be taxed.").

Several courts have agreed with the Tenth Circuit. *See United States v. Ferguson*, 788 F. Supp. 580, 581 (D.D.C. 1992) ("To the extent section 922(o) applies, therefore, the registration requirement is now unconstitutional"); *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117 (C.D. Ill. 1991); *United States v. Gambill*, 912 F. Supp. 287, 289-90 (S.D. Ohio 1996), *aff'd*, 129 F.3d 1265 (6th Cir. 1997) ("It is hard to understand how any circuit could find such a conviction permissible when the provisions of the NFA have been totally eclipsed by section 922(o).").

The Fourth Circuit rejected the reasoning in *Dalton* in *United States v. Jones*, 976 F.2d 176 (4th Cir. 1992). In *Jones*, a mechanical engineer had invented a method to convert semi-automatic shotguns into machineguns. *Id.* at 181. He was charged with violations of the NFA relating to manufacturing a

machinegun without permission, 26 U.S.C. § 5822, possessing a firearm that was manufactured in violation of the act, 26 U.S.C. § 5861(c), transportation of unregistered firearms, 26 U.S.C. § 5861(j), and transferring a firearm in violation of the act, 26 U.S.C. § 5861(e).  He was not charged with mere possession of an unregistered machinegun under 26 U.S.C. § 5861(d).

Jones challenged his conviction on the ground that the government should have charged him under 18 U.S.C. § 922(o), rather than 26 U.S.C. § 5861.  He noted that following the passage of the FOPA it was "impossible for him to receive the authorizations required under the National Firearms Act."  *Id.* at 182.  Therefore, either the law had been "implicitly repealed" or enforcing the law against him was fundamentally unfair.  He also argued, like the defendant in *Dalton*, that the law had "lost its constitutional basis" because the government refused to register machineguns after 1986.  Characterizing both arguments as due process challenges, the court disagreed.  It held that the NFA was not repealed by the FOPA and that it was not fundamentally unfair to punish the defendant for possession of an unregistered

machinegun, even though registration was impossible, because one "can comply with both acts by refusing to deal in newly-made machine guns[.]" *Id.* at 183. Finally, the Court held that the statute was valid as a tax measure because the *making* of illegal machineguns continues to be taxed after FOPA. *Id.* at 183. The Court reasoned that "knowing the chain of possession and transfer assists in determining who made the firearm and hence is 'supportable as in aid of a revenue purpose.'" *Id.* at 184 (*quoting Sonzinsky*, 300 U.S. at 513). Several circuits have agreed with the reasoning in *Jones. See, e.g., United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994); *United States v. Grier*, 354 F.3d 210 (3rd Cir. 2003).

This Court initially sided with the Tenth Circuit. In *United States v. Kurt*, 988 F.2d 73 (9th Cir. 1993), the defendant was charged with simple possession of an unregistered machinegun under 26 U.S.C. § 5861(d). Like the defendant in *Dalton*, he argued that application of the statute to him was unconstitutional because it was premised on Congress' power to tax under Article I, Section 8, but the government refused to accept registration or tax

payments for the possession of machine guns starting in 1986. *Id.* at 75-76. He also contended, like the defendant in *Dalton*, that it would be fundamentally unfair to convict him for possessing an unregistered machinegun after 1986 because it would have been impossible for him to register it then. *Id.* This Court noted "with favor" the reasoning in *Dalton*, but found it unnecessary to its decision because the defendant had not established that he first possessed the machine gun at some point after May 19, 1986. "Since § 5861 could constitutionally be applied to a person who purchased a machine gun prior to May 19, 1986, it was Kurt's burden to show that he was a member of the class arguably unconstitutionally affected by the statute." *Id.*

However, in 1996, this Court summarily rejected the reasoning in *Kurt* as dicta and adopted the reasoning of *Jones* in a *per curiam* decision. *Hunter v. United States*, 73 F.3d 260 (9th Cir. 1996). The defendant in *Hunter* was charged with simple possession of an unregistered machinegun. This Court nonetheless reasoned, like the Fourth Circuit, that it was not fundamentally unfair to punish the defendant for possession of an

unregistered machinegun, even though registration was impossible, because "individuals could comply with both acts by refusing to deal in *newly-made* machine guns." *Id.* at 262 (*quoting Jones*, 976 F.2d at 183) (emphasis added). It also repeated *Jones'* reasoning that § 5861(d) was within Congress' power to tax because "[t]he manufacture of machine guns continues to be taxed, and knowing the chain of possession of a firearm would help the government determine who made it; thus, requiring registration for possession still facilitates taxation." *Hunter* 73 F.3d at 262 (*citing Jones*, 976 F.2d at 184).

This Court's reasoning in *Hunter* is fundamentally flawed. When it adopted the reasoning of *Jones* without meaningful analysis, it ignored a crucial distinction between the subsections of the NFA at issue in *Jones* (26 U.S.C. § 5822, 26 U.S.C. § 5861(c), (e), and (j)), and the subsection at issue in that case (26 U.S.C. § 5861(d)). *Jones* was prosecuted for *manufacturing* and *transferring* machineguns, whereas the defendant in *Hunter* (like the defendant in *Dalton*, and like Mr. Bronsozian in this case) was charged only with possession of a machinegun. Whereas the

*making* of machineguns and *transfer* of previously registered machineguns could arguably continue to generate revenue, the mere possession of a previously unregistered machinegun cannot. Moreover, a tax on the *making* of machineguns cannot aid in determining the chain of possession for machineguns that were not previously registered as of May 19, 1986, because the government will not accept applications to register those firearms.

In any case, intervening case law from the United States Supreme Court has interpreted the Article I power to tax in a way that undermines and supersedes the decision in *Hunter*.

### 2.    The Affordable Care Act case

In *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012), the Supreme Court evaluated the constitutionality of two subsections of the Affordable Care Act, one of which was the individual mandate to purchase health insurance on the private market.  The individual mandate also called for a "shared responsibility payment" for those who did not purchase private health insurance.  The Court held that the individual mandate of the ACA was not justified under Congress' power to regulate

interstate commerce, but considered an alternative argument that the challenged portions were valid under Congress' power to tax. The Court examined its precedent to identify the essential features that a law must have to be justified under the tax power.

First, the Court held, a valid tax law <u>must actually raise</u> <u>some revenue</u>. *Id.* at 2594 (the "essential feature of any tax . . . [is that it] produces at least some revenue for the Government.") (*quoting United States v. Kahriger*, 345 U.S. 22, 28 (1953); *see also United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir.1972) ("The test of validity is whether on its face the tax operates as a revenue generating measure and the attendant regulations are in aid of a revenue purpose."), *In re Bradford*, 534 B.R. 839, 860 (Bankr. M.D. Ga. 2015) ("Congress need not intend for the regulation to produce revenue so long as does so in fact."); *Farmer v. Higgins*, 907 F.2d 1041, 1042-44 (11th Cir. 1990). The Court held that the individual mandate of the ACA met this requirement because it imposed a "shared responsibility payment" that was "expected to raise about $4 billion per year by 2017." *Id.* at 2594.

Second, the Court held, <u>a tax cannot be a "penalty</u>." *Id.* at 2595-96. "In distinguishing penalties from taxes, this Court has explained that 'if the concept of penalty means anything, it means punishment for an unlawful act or omission.'" *Id.* (*quoting United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996); *See also Bailey v. Drexel Furniture Co*. (U.S. Reports Title: Child Labor Tax Case), 259 U.S. 20, 38 (1922) ("there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment."). The Court drew on its precedent in *Drexel Furniture* to determine three practical characteristics that distinguish a prohibited "penalty" from a permissible "tax." First, a tax must not impose an "exceedingly heavy" burden. The tax in *Drexel Furniture* imposed a fee of 10 percent of a company's net annual income on those who employed children, regardless of how many children were employed, which the Supreme Court held to be excessive. Second, penalties can be distinguished from taxes because they are imposed only on knowing violators of the statute.

"Such scienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law." *Id.* at 2595. Third, courts could look to the enforcement mechanism. One detail that revealed the "tax" in *Drexel Furniture* as a penalty was that it enforced in part by the Department of Labor, an agency "responsible for punishing violations of labor laws, not collecting revenue." *Id.*

Applying those criteria, the Supreme Court held that the shared responsibility payment did not constitute a "penalty." It was not excessive, because it was required by law to be less than the cost of the alternative of purchasing insurance. *Id.* at 2595. There was no scienter requirement. *Id.* And the payment was collected by the IRS "through the normal means of taxation." *Id.* The Court emphasized that in collecting the shared responsibility payment "the Service is not allowed to use those means most suggestive of a punitive sanction, such as criminal prosecution." *Id.* Failure to comply with the law carried no stigma, nor the threat of prosecution. "[I]f someone chooses to pay rather than obtain health insurance, they have fully complied with the law,"

and "[n]either the Act nor any other law attaches negative legal consequences to not buying the health insurance, beyond requiring a payment to the IRS." *Id.* at 2597.

*Sebelius* represents a significant clarification of the law governing the limits of Congress' power to regulate under Article I, § 8. It cannot be reconciled with the flawed holdings of *Hunter* and *Jones*. Therefore, this Court is bound by the decision in *Sebelius*. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (Where Supreme Court precedent "undercut[s] the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable" district courts "should consider themselves bound by the intervening higher authority and reject the opinion of [the circuit court] as having been effectively overruled.") Under *Sebelius*, it is clear that Section 5861(d) cannot be justified under Congress' power to tax, and the *per curiam* decision in *Hunter* has been effectively overruled.

### 3.     Section 5861(d) is unconstitutional after *Sebelius*

#### a.     Section 5861(d) generates no revenue

Section 5861(d) generates no revenue from the taxation of the possession of machineguns not previously registered by May 19, 1986.  That fact, on its own, invalidates the statute as a tax measure.  The Justice Department has acknowledged as much:

> Section 922(o) of Title 18 makes it unlawful to transfer or possess a machine gun made after May 19, 1986. In addition, under the NFA, it is unlawful to manufacture or possess a machine gun without first registering it with the Secretary of the Treasury and paying applicable taxes. 26 U.S.C. §§ 5822, 5861. As a result of the enactment of 18 U.S.C. § 922(o), the Secretary of the Treasury no longer will register or accept any tax payments to make or transfer a machine gun made after May 19, 1986. Accordingly, because it is impossible to comply with the registration and taxation provisions in the NFA, prosecutors should charge the unlawful possession or transfer of a machine gun made after May 19, 1986 under § 922(o).

U.S. Attorneys' Manual 9-63.516 Charging Machinegun Offenses Under 18 U.S.C. S 922(o), Instead of Under the National Firearms Act, 1999 WL 33219894, at *1.

#### b.     Section 5861(d) is a penalty

Section 5861(d) also has all of the hallmarks of a prohibited penalty as that concept is described in *Sebelius*.  First, regarding

46

the "burden" of the tax, since 1986, no tax payments have been collected on the possession of previously unregistered firearms. Instead, the only possible consequence is a criminal prosecution. Whereas a person who did not care to purchase an individual health plan has the option to simply pay a shared responsibility payment, a person possessing an unregistered machinegun after 1986 has no such choice. He cannot pay the applicable tax even if he wants to because the government will not accept it. The lack of any legal options to escape the punitive nature of § 5861(d) renders it a penalty. As Chief Justice Roberts explained:

> By contrast [to its power to regulate interstate commerce], Congress's authority under the taxing power is limited to requiring an individual to pay money into the Federal Treasury, no more. If a tax is properly paid, the Government has no power to compel or punish individuals subject to it. We do not make light of the severe burden that taxation—especially taxation motivated by a regulatory purpose—can impose. But imposition of a tax nonetheless leaves an individual with a lawful choice to do or not do a certain act, so long as he is willing to pay a tax levied on that choice.

*Id.* at 2600. Whereas criminal prosecution was explicitly ruled out as a means of enforcing the ACA's individual mandate, criminal prosecution is the *sole means* of enforcing § 5861(d).

47

Second, there is a heightened scienter requirement for establishing liability under § 5861(d). In *Staples v. United States*, 511 U.S. 600, 616 (1994), the Supreme Court held that in order to be found guilty of violating the statute the accused must know of the specific features of a firearm that bring it within the prohibition of the act. *Id.* at 619. A similar scienter requirement convinced the Supreme Court to find the tax on employing child labor to be a penalty because it singled out only knowing violators of the law. *See Drexel* 259 U.S. at 38. Conversely, the lack of a scienter requirement convinced the court that the "shared responsibility payment" provided for by the ACA was not a penalty. While there is no stigma associated with choosing to pay a shared responsibility payment rather than purchase an individual health plan, the stigma of a felony conviction is severe. *C.f. Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 782 (1994) (holding that a tax on goods "the taxpayer never lawfully possessed has an unmistakable punitive character.").

### c.     Section 5861(d) is enforced by ATF

Finally, the statute is enforced by the Bureau of Alcohol, Tobacco, and Firearms, which is a branch of the Department of Justice, overseen by the Attorney General and responsible for enforcing and punishing criminal laws, not collecting revenue. As noted above, the only enforcement mechanism is prosecution, as it is impossible to pay any tax. As the Supreme Court stated in reference to the federal taxation of liquor following prohibition: "[E]ven though the statute was not adopted to penalize violations of the amendment, it ceased to be enforceable at the date of repeal, if, in fact, its purpose is to punish rather than to tax." *United States v. Constantine*, 296 U.S. 287, 294 (1935).

May 19, 1986 was the last day that 26 U.S.C. § 5861(d) had the potential to generate revenue with respect to machineguns that were not previously registered. Since that point, it has generated only criminal prosecutions. Because the statute now imposes a penalty, rather than a tax, it cannot be justified under Congress' enumerated power under Article I, § 8, cl. 1 to lay and collect taxes. To the extent that this Court's decision in *Hunter* holds otherwise, it has been overruled by *Sebelius*.

**B. Punishing Mr. Bronsozian for Possessing an Unregistered Machinegun Pursuant to 26 U.S.C. § 5861(d) Violates Due Process Because It Would Have Been Impossible for Him to Comply with the Law**

Section 5861(d) provides that it "shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . ." The statute's reference to registration implies that the "perimeter" of the offense is "marked by the terms of the registration requirement . . . ." *Haynes* 390 U.S. at 93. The possession of a firearm and the failure to register that firearm are "equally fundamental ingredients" of 26 U.S.C. § 5861(d). *Id.* at 95.

It would have been impossible for Bronsozian to register the MAC-10 because, as a machinegun manufactured after May 19, 1986, it was "922[o] restricted." ER 109. Because it was impossible for Bronsozian to comply with the registration requirement, he cannot be punished for failing to do so. *See Dalton*, 960 F.2d at 124. Bronsozian acknowledges that this Court rejected a similar argument in *Hunter*, 73 F.3d at 260.

**C.    18 U.S.C. § 922(o) Repealed 26 U.S.C. § 5861(d)**

"There are two well-settled categories of repeals by implication: (1) Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act." *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936); *see also Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 663 (2007).  Here, §922(o) covers the "whole subject" of §5861(d) and the statutes are irreconcilable.

Section 5861(d) makes it unlawful for any person to receive or possess a firearm which is not registered to him in the NFRTR. §922(o) bans all machineguns, regardless of whether they are registered.  Thus, this is not a circumstance in which the Court could reconcile the two conflicting statutes by "allowing the earlier statute to serve as a narrow exception to the later one." *See Ledezma-Galicia v. Holder*, 636 F.3d 1059, 1070 (9th Cir. 2010). Section 922(o) targets the entire scope of §5861(d), suggesting that

it was "intended as a substitute." *Posadas*, 296 U.S. at 503.

Therefore 18 U.S.C. §922(o) has repealed 26 U.S.C. § 5861(d). *See United States v. Gambill*, 912 F.Supp.287, 289 (S.D. Ohio 1996) ("Section 5861(d) and section 922(o) are utterly irreconcilable.").

**D.  The Government Violated Mr. Bronsozian's Right to Due Process when it Withheld Exculpatory Evidence in the Possession of John Carr of the Vagos Outlaw Motorcycle Gang's Propensity for violence**

The Due Process Clause requires the government to disclose evidence that is favorable to the accused when it is material to either guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

**1.  The evidence was suppressed**

Evidence is suppressed by the government where it is in the possession of a government agent and the prosecutor fails to exercise due diligence in identifying and producing it. *United*

*States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009). The prosecutor need not be personally aware of the evidence. "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 479-80 (9th Cir. 1997)(*en banc*).

"[A] prosecutor is required to use due diligence—affirmative due diligence—to gather *Brady* material from known and plausible sources of exculpatory information and then to turn over any *Brady* material that is found." *United States v. Cerna,* 633 F. Supp. 2d 1053, 1061 (N.D. Cal. 2009). The duty to inquire about *Brady* material is heightened where a prosecutor has a "specific reason" to suspect that *Brady* material may reside at a source, or where defense counsel makes a "narrowly defined and well directed request . . . explaining why exculpatory material might be found in a certain file." *Id*.

Here, the government was repeatedly put on notice that Bronsozian's defense turned on his reasonable fear of retaliation from the informant due to the informant's affiliation with the

Vagos. The government was also on notice that John Carr, its main witness, was an expert on the Vagos and had personal knowledge of the gang's violent nature. Therefore, the government had an affirmative duty to inquire whether Carr had evidence the Vagos were a violent outlaw motorcycle gang whose members commit violent acts on behalf of the gang. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Despite the repeated and specific requests from the defense, the government never asked Carr whether he had any information about the Vagos and their propensity for violence. *Price*, 566 F.3d at 909 ("[I]f the prosecutor either failed to disclose the information or *failed to discover that his agent knew of or possessed it*, a *Brady* violation occurred.") (emphasis added).

### 2. The evidence was favorable to the defense

The District Court erred when it held that Carr's statements in *Kane* were not "exculpatory or impeachment evidence."

54

"Any evidence that would tend to call the government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013). Evidence need not exonerate the defendant in order to be "exculpatory" and thus "favorable" to the defense. Rather, it need only be "advantageous" to the defendant or "tend to call the government's case in doubt." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015). "[E]vidence that has any affirmative, evidentiary support for the defendant's case or any impeachment value is, by definition, favorable." *Id.* Evidence can be favorable even where it has "only minimal" value. *Id.*

A prior statement by a witness that supports the theory of the defense or discredits a government witness is exculpatory, regardless of whether it is in direct conflict with the witness' trial testimony. *See United States v. Han*na, 55 F.3d 1456, 1459 (9th Cir. 1995) ("significant discrepancies" between police report and officer's testimony made it likely that the witness made additional inconsistent statements, but prosecution failed to inquire); *United States v. Olsen*, 704 F.3d 1172, 1182 (9th Cir. 2013) ( "small

misstatements" by government expert that displayed a "tendency for conclusions to become stronger as the case developed" could be used by the defense to question the witness' "truthfulness on a more general level, by suggesting a proclivity to shade his testimony in favor of the government's case."); *United States v. Kohring*, 637 F.3d 895, 909 (9th Cir. 2011) (witness' statement that he "never asked" politician to make decisions in exchange for cash was not necessarily inconsistent with his trial testimony that he paid the politician in part to *encourage* him to undertake legislative acts, but was favorable to the defense).

Carr's prior statements in *Kane* in which he unequivocally described the Vagos as a violent criminal organization with a propensity to physically attack those who come into conflict with it or show "disrespect" were clearly favorable to the defense.

First, Carr's statements that people who defy the Vagos "may be beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot" certainly makes Bronsozian's defense that he feared the Vagos organization generally more persuasive than it would otherwise be. *See United*

*States v. Stever,* 603 F.3d 747, 755 (9th Cir. 2010) (government reports describing Mexican Drug Trafficking Organizations' *modus operandi*, including their use of private land and their pattern of not working with Caucasians was relevant and its exclusion violated defendant's right to present a defense).[7]

Second, had the government produced Carr's statements in *Kane* about the expectations of a "prospect" and the role of the sergeant at arms as the "enforcer" of his chapter, defense counsel would have been able to make compelling arguments about the threat posed by *this informant in particular.* Carr admitted that "Pete" was a prospect at the time of the transaction in this case, but he denied that prospects were required to commit acts of violence on behalf of the gang. Had Carr's prior statements from *Kane* been produced, defense counsel could have challenged and discredited that testimony. After all, according to Carr's prior

---

[7] This Court has routinely approved of the presentation of expert testimony about the structure and *modus operandi* of criminal gangs in criminal cases. *See, e.g., United States v. Vera*, 770 F.3d 1232, 1238 (9th Cir. 2014); *United States v. Murillo*, 255 F.3d 1169, 1176 (9th Cir. 2001). Carr's testimony about the propensity of the Vagos to engage in violence was offered for just that purpose in *Kane*. *See United States v. Kane*, No. 2:13-CR-250-JAD-VCF, 2015 WL 3823023, at *5 (D. Nev. June 19, 2015).

testimony in *Kane*, as a "prospect member" Pete would have been "trying to show [his] worthiness to the organization" and prove that he was "willin' to do whatever it takes to become a member." ER 88 (*United States v. Kane*, CR 13-250-JAD-VCF, Dkt. No. 190). The fact that Pete was later promoted to full patch membership in the Vagos and became the sergeant-at-arms -- the "enforcer, so to speak, of the chapter" -- suggests that he would have been willing to engage in violence for the gang at the time he pressured Bronsozian to sell him the MAC-10.[8] Therefore, Carr's statements corroborated Bronsozian's fear of the informant *individually*.

Third, Carr's statements corroborated of the testimony of Albert Kakish. Kakish testified that he had seen members of the Vagos engage in violence and crime, including fighting, robbery and theft, and that he and Bronsozian had discussed those incidents. ER 238. But Kakish was a longtime friend of Bronsozian's and he had had multiple prior convictions. ER 249.

---

[8]     The district court acknowledged that "the fact that the defendant may have been aware or was aware of the fact that this informant was a gang member and perhaps even that he was trying to prove himself could have some circumstantial relevance to his state of mind." ER 222.

He had neither the specialized knowledge nor the apparent credibility of Special Agent Carr. If Bronsozian had the benefit of independent corroborating evidence from a law enforcement expert about the violent tendencies of the Vagos the jury would have been more likely to believe Kakish's testimony.

Finally, Carr's prior statements about the violent propensity of the Vagos would have undermined the credibility of his trial testimony. Without the benefit of Carr's previous statements in *Kane*, defense counsel was forced to examine Carr by asking imprecise and uninformed questions about the Vagos. For example, defense counsel asked Carr generally whether prospective members of the Vagos were required to commit acts of violence in order to be promoted, to which Carr responded with an unequivocal "no." Carr went on to testify that that "there are "a lot of guys that get in the Vagos that don't commit crimes" and that "don't use drugs." ER 197-198. This misleading testimony left the jury with the impression that the Vagos was not necessarily a violent organization, nor even a criminal one.

Had the government produced Carr's prior statements, defense counsel's questions would have been more targeted and effective. Rather than question Carr about whether violence was *required* for membership, defense counsel would have asked Carr whether "[p]ersons in conflict with or who might be perceived to have shown disrespect to the gang may be beaten severely or even killed by being kicked repeatedly with steel-toed boots, stabbed, or shot." The unavoidable answer to this question – "yes" – would have left the jury with a radically different impression of the Vagos. That statement would have been more than enough to make the point, both on cross-examination and in closing, that Bronsozian's fear of the Vagos was both real and reasonable. *See Comstock,* 786 F.3d at 708 (holding that disclosure of witness' prior statements "would have transformed [the] cross-examination and the trial. Instead of having to ask open-ended questions . . . counsel would have been armed with [the witness'] specific admission."). *See Amado v. Gonzalez*, 758 F.3d 1119, 1139 (9th Cir. 2014) ("The suppressed information would have added to the

force of the cross-examination and defense counsel's closing

argument").

### 3. Bronsozian was prejudiced

 "[A] showing of materiality does not require demonstration

by a preponderance that disclosure of the suppressed evidence

would have resulted ultimately in the defendant's acquittal."

*Kyles*, 514 U.S. at 434. "The question is . . . whether in its absence

he received a fair trial, understood as a trial resulting in a verdict

worthy of confidence." *Id.* Confidence is undermined where

favorable evidence withheld by the government "could reasonably

be taken to put the whole case in a . . . different light." *Id.*

The government's withholding of Carr's previous statements

in *Kane* prejudiced Bronsozian because it went to the heart of his

only defense. The sole issue in dispute was whether Bronsozian

knew that the MAC-10 was fully automatic. There was no

physical evidence that tended to prove Bronsozian's knowledge.

The external markings of the gun were consistent with a semi-

automatic weapon, and in fact that MAC-10 was originally

manufactured as a semi-automatic. There was no evidence that

Bronsozian had ever shot the gun or taken it apart to examine its internal parts. The MAC was never fingerprinted. The only other way to determine whether Bronsozian knew that the gun was fully automatic would have been to "field test" it by depressing the trigger and sliding the bolt. There was no evidence that Bronsozian had ever done so. The only evidence of Bronsozian's knowledge that the gun was automatic was his statements to the informant and Special Agent Carr during the transaction.

Bronsozian's only explanation why he would make those statements, even though he did not know whether or not they were true, was that the informant pressured him to say that the gun was automatic, and he did what the informant said because he was afraid of the informant as a result of his affiliation with the Vagos. Therefore, Bronsozian's fear of the Vagos, and the reasonableness of that fear, went to the heart of his defense.

The jury heard evidence that the informant was affiliated with the Vagos, and it heard evidence from Kakish that the gang had a reputation for violence and that the informant had committed acts of violence. But the evidence was inherently

suspect because it came from a family friend who the government could and did attack as biased. Moreover, Bronsozian's explanation had to compete with a much simpler narrative offered by the government – that Bronsozian stated the gun was an automatic because that was the truth. Absent some corroborating evidence of Bronsozian's reason to fear the informant and his gang, Bronsozian's defense stood little chance of success.

If the jury had heard evidence from a law enforcement expert of the Vagos history of violence, particularly against members of the public that are seen as defying its orders or disrespecting the gang, then the jury would have "seen Bronsozian's defense in an entirely different light." *See Kyles*, 514 U.S. at 434. And if the jury had heard that "Pete" was working his way up the ranks of the Vagos at the time of the transaction and that he ultimately became the Sergeant at Arms for his chapter, it would have been more likely to credit Bronsozian's defense he feared that if he did not comply with the informant's directions he may be physically harmed by "Pete."

The district court held that Bronsozian had not shown prejudice because "Carr's testimony [in Kane] could not have been used to impeach him during trial, ER 11. This is simply wrong. Had the prosecution produced Carr's statements prior to trial defense counsel's examination would have been tailored to his prior statements in *Kane*. To the extent that Carr merely affirmed the truth of his prior statements in *Kane*, as he did post-trial in an evidentiary hearing, his testimony would have been profoundly helpful to Bronsozian. *See infra*, VIII(D)(2).

The district court also held that Carr's personal knowledge of the Vagos'[] propensity for violence, without any knowledge regarding the Defendant's awareness of those same facts, could not have materially affected the jury's conclusion regarding the Defendant's understanding of the CI's violent nature." ER 11. But Carr's testimony was crucial because it <u>corroborated</u> Bronsozian's fear that he would be harmed if he did not do as the informant said. *See DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001); *United States v. James*, 169 F.3d 1210, 1214 (9th Cir. 1999).

In *James*, the defendant attempted to introduce evidence that the victim of a shooting had a history of violence to corroborate her self-defense case. The district court allowed the defendant to testify about violence acts by the victim that she was personally aware of at the time of the attack, but not "extrinsic" records that reflected violent conduct of the victim she didn't know about at the time. *Id*. at 1213. The district court explained that "the only relevant facts concerning [the victim's] past were the ones defendant knew about; only to that extent could her state of mind at the time of the shooting have been affected by [the victim's] past misconduct." *Id*. at 1214. This Court reversed, holding that the district court abused its discretion when it excluded the "extrinsic" evidence of the victim's history of violence.

The Court explained that the evidence had two legitimate functions: to corroborate the defendant's testimony that she had heard of the victim's violent past, and to corroborate her statement that she had reason to be afraid of him. *Id*. The district court's exclusion of the evidence on the ground that the defendant had not heard of it prior to the attack was "too narrow"

because it ignored the value of the evidence as independent corroboration of the defense. *See Id.* ("The records corroborated her testimony, and the records corroborated her reason to fear.").

Likewise here, the district court's view of the value of Carr's statements in *Kane* was "too narrow" because the district court failed to appreciate the value that the statements had as corroboration for the defense. The issue was not merely whether Bronsozian feared the Vagos based on the facts known to him at the time, but whether his fear was *reasonable* taking into account the objective reality that the Vagos were, in fact, a dangerous criminal organization that attacked and killed members of the public that it perceived to be "disrespectful" to the gang.

## E. The Government Violated Mr. Bronsozian's Right to Due Process When it Presented Testimony by John Carr that Falsely Minimized the Violent, Criminal Nature of the Vagos Outlaw Motorcycle Gang

Not only did the government fail to produce Special Agent Carr's prior statements about the violent propensity of the Vagos, it also stood idly by while Carr gave misleading testimony suggesting that the Vagos were neither a dangerous organization nor even a criminal one. Carr's affirmative testimony minimizing

the dangerousness of the Vagos violated Bronsozian's due process rights under *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and exacerbated the prejudice of the *Brady* violation.

Fundamental fairness requires that a conviction not be based, even in part, on false testimony. *Id. at* 269; *Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994). A *Napue* violation does not depend on whether the trial prosecutor knows that a witness' testimony is false. The knowledge of one prosecutor can be imputed to "an entire prosecution office." *Browning v. Baker*, 875 F.3d 444, 460 (9th Cir. 2017) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972). Similarly, a police officer's knowledge that trial testimony was false can be imputed to the prosecutor. *Id.*; *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008) ("*Napue* and *Giglio* make perfectly clear that the constitutional prohibition on the 'knowing' use of perjured testimony applies when any of the State's representatives would know the testimony was false); *Phillips v. Ornoski*, 673 F.3d 1168, 1187 (9th Cir. 2012) (citing *Giglio*, 405 U.S. at 154). Therefore, knowledge of Carr's statements in *Kane* is imputed to the prosecutors (*via* Carr himself, as an agent of the

67

government, or the District of Nevada United States Attorney's Office). Even assuming that knowledge was not imputed to the prosecutors, they had an independent duty to at least ask Carr about his prior statements. *See Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) ("When a prosecutor suspects perjury, the prosecutor must at least investigate" further, consistent with his "duty to correct what he knows [or suspects] to be false and elicit the truth.") (citing *Napue*, 360 U.S. at 270).

## 1. Carr's testimony was false and misleading

The district court erred when it held that there was no *Napue* violation because Carr's trial testimony was not precisely contradicted his proposed testimony in *Kane*. ER 9. The Court reasoned that Carr's trial testimony in this case that violence on behalf of the gang was not *required* to become a full member was not technically in conflict with his prior statements in *Kane* that Vagos members were rewarded for violence and known to attack or kill members of the public that were perceived as disrespectful by kicking them with steel-toed boots. *Id.*

The district court's fine parsing of Carr's testimony and its narrow focus on whether it was precisely contradicted in *Kane* is not consistent with *Napue's* concern for fairness and due process. The issue is not merely whether Carr's testimony was contradicted by his previous testimony. The issue is whether Carr's testimony, viewed as a whole, was so misleading that it "misrepresented the truth." *See Browning*, 875 F.3d at 459. Presenting testimony that "misrepresents the truth" violates *Napue*, even if the testimony, viewed in the abstract, may not be literally false. *Browning*, 875 F.3d at 459; *Miller v. Pate*, 386 U.S. 1, 6 (1967); *see also Towery v. Schriro*, 641 F.3d 300, 309 (9th Cir. 2010) (declining to decide whether "accurate testimony could be delivered in a sufficiently misleading context to make the evidence false for *Napue* purposes"). Even if Carr's testimony was not "indisputably" false (either in comparison with his testimony in *Kane* or in the abstract) it clearly misrepresented the truth.

## 2.    Bronsozian was prejudiced

A *Napue* violation is material when there is "any reasonable likelihood that the false testimony could have affected the

judgment of the jury[.]" *Phillips*, 673 F.3d at 1189 (quoting

*United States v. Agurs*, 427 U.S. 97, 103, (1976)). The prejudice of

*Brady* and *Napue* errors must be evaluated collectively. *Jackson*,

513 F.3d at 1076, *Kyles*, 514 U.S. at 436. Even if a *Napue* error is

not material standing alone, combined with a *Brady* error it can

undermine confidence in the verdict. *Jackson*, 513 F.3d at 1076.

This is a classic circumstance in which the *Napue* violation

reinforced and amplified the prejudice of the *Brady* violation.

Withholding the evidence of Carr's statements from the defense

left the defense with no little factual support for the sole defense

advanced at trial. This led to an uninformed cross-examination of

Carr that arguably left the defense in a worse position than it

would have faced with no cross-examination at all because Carr's

testimony undermined the defense theory rather than reinforcing

it. Confident that the defense did not know about his prior

statements in *Kane*, Carr was emboldened to offer his observation

that he knew "a lot of guys" in the Vagos who "don't commit

crimes" and "don't use drugs." ER 197-198. Had the government

produced Carr's prior statements, it is doubtful that he would

have gone so far. Because of the *Brady* violation, he was allowed to get away with it. The combined impact of the *Brady* and *Napue* errors eviscerated Bronsozian's only defense. Therefore, this Court cannot have confidence in the verdict.

## IX.  CONCLUSION

For the foregoing reasons, this Court should dismiss the indictment because the application of Section 5861(d) to the possession of machineguns after May 19, 1986 is unconstitutional. Additionally, the Court should vacate Bronsozian's conviction as a result of *Brady* and *Napue* errors that prejudiced the defense.

Dated:  February 26, 2018          BIENERT, MILLER & KATZMAN, PLC


By: ___*/s/ John L. Littrell*___
     John L. Littrell


Attorneys for Defendant
NERSES NICK BRONSOZIAN,

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that this brief is proportionately spaced, has a typeface of 14 points or more and contains 13,407 words as counted by the Microsoft Word 2007 word processing program used to generate the brief.

Dated: February 26, 2018

*/s/ John L. Littrell*
John L. Littrell

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, counsel is unaware of any related cases pending in this Court.

*/s/ John L. Littrell*

John L. Littrell

# APPENDIX

The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States . . . .

U.S. Const. art. I, § 8, cl. 1.

It shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record . . . .

26 U.S.C. § 5861(d).

(o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to--
(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C.A. § 922(o)(1), (o)(2)(B).

9th Circuit Case Number(s) | 17-50197

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the
United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system
on (date)  Feb 26, 2018  .

I certify that all participants in the case are registered CM/ECF users and that service will be
accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | /s/ Toni Lindemann

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the
United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system
on (date)  .

Participants in the case who are registered CM/ECF users will be served by the appellate
CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users.  I
have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it
to a third party commercial carrier for delivery within 3 calendar days to the following
non-CM/ECF participants:

Signature (use "s/" format)